R. B. GAGE MANUFACTURING COMPANY *vs.* WOODWARD & STILLMAN.

When, for cotton delivered under a contract but inferior in quality to what was contracted for, satisfactory cotton was substituted by the vendor with the vendee's consent, and the vendee used the cotton and made full payment under the contract, the vendee has no right of action for violation of the contract.

When the terms of a contract are clear, definite, and unequivocal, parol evidence of trade custom is not admissible in an action for breach of the contract.

Hence, in an action for breach of such a contract for the sale of baled cotton, evidence of trade custom as to the return of inferior bales, and as to waiver of objection to the bales by using the cotton, is not admissible to show that the vendee, who knew the custom, and had used some of the cotton delivered under the contract and below the contract standard, was making a claim inconsistent with the custom and in bad faith.

PLAINTIFFS' petition for a new trial.

*August* 1, 1891. TILLINGHAST, J. This is a petition for a new trial on the grounds that the verdict, which was for the defendants, was against the evidence, and that certain rulings of the justice presiding at the trial were erroneous.

This action is *assumpsit* to recover damages for an alleged breach of warranty in the sale of cotton.

It is based upon two contracts in writing, by which the defendants agreed to furnish and deliver to the plaintiff certain specified quantities of cotton, of defined grades and staple, and equal to defined samples.

Said contracts are as follows, viz. : —

October 12, 1887.

*R. B. Gage Mfg. Co.* : —

We have bought for your account of Woodward & Stillman, New York, 780 Bl. C., to be delivered as follows : 20 bales weekly from Nov. 1, '87, to Aug. 1, '88, delivered in Providence. Good middling in grade and staple equal to type marked A B E. Price, ten and one quarter cents per pound (10 1-4c.) for November delivery, and 1-8c. added to each month thereafter. Cash 30 days from each delivery, adding interest after 10 days. It is agreed that

if the buyer's mill shall be stopped running by fire, or other un-
avoidable accident, this contract shall be inoperative during such
stoppage.

WOODWARD & STILLMAN,
[Signed,]         Per A. W. DENNIS.

December 11, 1888.

*R. B. Gage Mfg. Co.:* —

I have bought for your account of Woodward & Stillman, New
York, 850 bales cotton, as follows: —

Grade.   Good Middling Texas 1 1-8 inch staple grade, equal to
samples marked G A G of lot now using.

Price.   One half cent above quotations of Good Middling Gulf
in N. Y. on day of each weekly delivery [Good Mid-
dling Gulf to-day being 10 5-16, price would be 10 13-
16]. Price to be fixed each Tuesday, as the market may
vary from present quotation up or down as case may be,
1-2 ct. above Good Middling Gulf.

With option of buyer at any time to take the cotton
undelivered on basis of above agreement, adding 1-8ct.
each month for carrying same.

Delivery.   Cotton to be landed Providence, reweighed on ar-
rival, and taken by R. B. Gage Mfg. Co. and stored at
their mill, and insured by them, and held in trust for
Woodward & Stillman until taken on weekly delivery
as above.

Terms.   Cash ten days, or for any additional time which may be
granted, interest to be added at 6 per cent. per annum.

WOODWARD & STILLMAN,
[Signed,]         Per A. W. DENNIS.

Correct.

R. B. GAGE MFG. CO.

Four hundred bales of the cotton called for by the first contract
were delivered in accordance therewith, and found to be satisfac-
tory to the plaintiff.

About March 19, 1888, the plaintiff made complaint to Mr.
Dennis, agent of the defendants, of the quality of the cotton.
Mr. Dennis went out to the plaintiff's mill, found some defective

bales of cotton, took them back, and exchanged them for cotton which the plaintiff accepted. He then instructed the plaintiff to reject and have exchanged in a similar way every bale which should be found unsatisfactory.

The proof shows that the plaintiff understood and followed this direction, giving to his superintendent, Mr. Rice, an order to that effect, which Mr. Rice says he obeyed.

The proof further shows that under this arrangement 32 bales in all of the cotton called for by the first contract were rejected by the plaintiff at various times, and other cotton satisfactory to him was received in exchange therefor; and furthermore that, in view of the plaintiff's continued expressions of dissatisfaction with the cotton designed to be furnished him, it was mutually arranged to give him cottons of other brands than those specified in said first contract in place of the remaining 180 bales which had been selected for him thereunder.

One lot of the substituted cotton consisted of 24 bales of the brand "B E D," worth $\frac{1}{4}$ cent a pound more than that called for by the contract, but finally settled for at the contract price. The remainder of the substituted cotton consisted of the brands "I F E" and "A C T," ten bales each weekly, the cotton being selected by the plaintiff. The proof further shows that in August, 1888, after some controversy over the price of the 24 bales of the brand "B E D," in which the defendant yielded to the plaintiff's demands, the plaintiff settled the bill of the defendants in full for the cotton called for by the first contract, making no claim for damages, and pronouncing the contract very satisfactory. The proof further shows that during the months of September, October, and November, 1888, after the expiration of the first contract and before the making of the second, the plaintiff bought cotton of the defendants through Mr. Dennis, the agent, to the amount of 275 bales, and paid for it, making no complaint of it, and no claim for damages, either upon it or upon the cotton of the first contract.

This being the state of the proof, it is very clear that the plaintiff has no cause of action growing out of said first contract. For, even assuming that some of the cotton delivered thereunder was not of the kind or quality stipulated for, yet so long as other cotton, which was satisfactory, was by mutual agreement substituted

in place thereof, and still further, in view of the fact that the plaintiff accepted and paid for all of said cotton, pronouncing it satisfactory, it is quite too late for him now to set up a breach of warranty concerning the same. We are therefore of the opinion that on the plaintiff's own showing he is clearly not entitled to a new trial so far as the first contract is concerned.

With regard to the cotton delivered under the second contract, we think the evidence very strongly preponderates in favor of the plaintiff's contention that quite a portion of it was not in accordance with the requirements of said contract, either in grade or quality, and also that the plaintiff sustained damage, to a greater or less extent, by reason thereof. The uncontradicted proof shows that some of it was false packed, off color, wet and rotten in the centre of the bale, and also of inferior grade and quality; that the plaintiff repeatedly made complaints concerning it; that some of the defective cotton was returned, the plaintiff receiving other cotton in place thereof; that the plaintiff used more or less of said defective cotton, and was damaged thereby; that the plaintiff was relying on this cotton with which to run his mill, and was practically obliged, for the time being at least, to use it, whether it was satisfactory or not, or stop his mill; and that the plaintiff was at the expense of building a storehouse for said cotton, and of reshipping 178 bales thereof to Providence, after his final refusal to go on under said contract.

We are therefore of the opinion that the plaintiff is entitled to a new trial, in so far as his claim is based upon the second contract.

During the trial, the defendants called as witnesses several well known and experienced dealers in cotton, for the purpose of proving the custom of manufacturers relating to the return of cotton found to be defective, or of inferior grade to that bargained for; and as to the notice required in order to lay a claim for damages in such cases. The following questions, which were admitted subject to the plaintiff's objection, illustrate the line of inquiry in this particular: —

*To Mr. Arthur W. Dennis.*

Q. "Now I will ask you what is the universal usage under contracts of this kind, as to within what time and when a claim must be made against the seller for cotton not being up to contract?

A. " The rule in this State in the trade, the custom in the cotton trade in Providence, is, that if a party makes a claim, the attention of the seller is called to it. If the question is settled, it is all right. If the party that has a claim on cotton has worked the cotton up and made no claim, the rule of the trade is, that there shall be no claim on cotton worked up. That is incorporated in the by-laws of the Board of Trade.

Q. " Independent of the Board of Trade, state whether or not that is the universal custom.

A. " That is the custom, and has been, before the Board of Trade was organized, and ever since I have been in the business.

Q. " If a person has a claim to make, it must be before it is worked up ?

A. " That is it exactly. No claim can be made on any cotton worked up.

### To Mr. Richard H. Deming.

Q. " I ask you what the custom is as to when claims are to be made upon any contract, for cotton not coming up to sample.

A. " On contracts it is customary, in case of a justified complaint, to take the cotton back, and give in exchange for it cotton that is up to the contract ; or to trade the cotton —

Q. " My question does not call for that. But supposing, in a case of this kind, — I want to know what the universal custom is, — supposing that the cotton, instead of your having notice of the fact of its not coming up to sample, that it is thrown in and run through the mill ?

A. " There is no claim whatever.

Q. " Is, or not, that the universal custom and practice in this cotton market ?

A. " That is universal the world over.

### To Mr. Francis W. Reynolds.

Q. " I ask you to state what the universal custom is, and has been ever since you have been in the business.

A. " The custom is, and always has been, where there was any trouble, to notify the broker or dealer at once, and, if he saw fit to go to the mill and look it up, he did so. The overseers there return

the cotton, and where the bagging has been cut we take bales back, — as a matter of policy more than anything else. But the rule is, that they must return the bales. They have a chance to look into them, and they can return them wholly if they please. If it is not satisfactory, it is their duty to notify the seller. If they see fit not to do it, but use portions and throw out other portions, they must leave enough to identify the cotton.

Q. " Now, is not the universal custom this, and has been, as to where you open it, and see fit, instead of returning, to use it?

A. " There is no claim. The reason for that is, that where a claim is made in that way, you must leave us something to identify the cotton, that we may make a claim on the party who shipped the cotton. Otherwise we can make no reclamation."

This line of evidence was admitted by the court, not for the purpose of explaining or modifying the contracts, which, being plain and unambiguous, required no explanations, but for the purpose of showing whether, under all the circumstances of the case, the claim of the plaintiff was a genuine one or not. That is to say, the plaintiff knowing of the custom before referred to, the proof shows that he knew of it; the evidence was admitted for the purpose of showing whether his conduct was consistent with the claim now set up.

The plaintiff's contention is, that, there being no uncertainty or ambiguity in said contracts to be explained by such evidence, it was inadmissible; and, further, that its direct effect was to vary the contracts and their legal effect.

The question raised is not free from doubt, but we are inclined to the opinion that the evidence was not admissible.

This kind of evidence is often resorted to, to explain the terms of a contract when uncertain or ambiguous, in order to ascertain the mutual intention of the parties to the instrument.

Says Chancellor Kent in his Commentaries, vol. 3, p. 326: " All mercantile contracts, if dubious, or made with reference to usage, may be explained by parol evidence of the usage. But the rule is checked by this limitation, that the usage, to be admissible, must be consistent with the principles of law, and not go to defeat the essential provisions of the contract."

Says Greenleaf on Evidence, vol. 1, p. 292 : " Proof of usage is

admitted, either to interpret the meaning of the language of the contract, or to ascertain the nature and extent of the contract, in the absence of express stipulations, and where the meaning is equivocal and obscure."

In *Trueman* v. *Loder*, 11 A. & E. 589, Lord Denman observed that the cases on the custom of trade go no farther than to permit the explanation of words used in a sense different from their ordinary meaning, or the addition of known terms not inconsistent with the written contract; and the court in that case leaned strongly against the appeal to custom, to explain or vary written contracts.

In 3 Kent Comment. 326, note *b*, it is stated that " the general rule on the subject of the admission of parol evidence to explain, by custom and usage, the meaning of the parties is, that if the words used in the contract be *technical*, or *local*, or *generic*, or *indefinite*, or *equivocal*, or by proof of extrinsic circumstance, parol evidence is admissible to explain by usage their meaning in the given case. If there be no such ingredient of uncertainty, then the evidence is not admissible. This seems to be the result of the decisions on the subject." *Yates* v. *Pym*, 6 Taunt. 446; *Blackett* v. *Royal Exchange Assurance Co.* 2 Cromp. & J. 244; *Fowler* v. *Ætna Fire Insurance Co.* 7 Wend. 270; *Dow* v. *Whetten*, 8 Wend. 160; *Astor* v. *Union Insurance Co.* 7 Cow. 202; *Coit* v. *Commercial Insurance Co.* 7 Johns. Rep. 385; *Barnard* v. *Kellogg*, 10 Wall. 383, 390; *Dawson* v. *Kittle*, 4 Hill, N. Y. 107; *Collender* v. *Dinsmore*, 55 N. Y. 200; 2 Phillips on Evidence, *796.

These authorities, while not expressly decisive of the particular question under consideration, yet throw light thereon by showing in what cases evidence of custom or usage *is* admissible; and in none of them, nor in any that we have been able to find, has it been held that it is admissible for any other purpose than those therein enumerated.

And while we are not prepared to say that such evidence may not be allowed for other purposes than those specified, yet we think it was not admissible for the purpose for which it was offered in this case.

Moreover, the policy of the law seems to be opposed to the extension of the rule beyond the adjudged cases.

In *The Schooner Reeside*, 2 Sumner, 567, 569, Judge Story uses the following vigorous language concerning evidence of this sort : —

" I own myself no friend to the almost indiscriminate habit of late years of setting up particular usages or customs, in almost all kinds of business and trade, to control, vary, or annul the general liabilities of parties under the common law, as well as under the commercial law.

" It has long appeared to me that there is no small danger in admitting such loose and unconclusive usages and customs, often unknown to particular parties, and always liable to great misunderstandings and misrepresentations and abuses, to outweigh the well-known and well-settled principles of law.  And I rejoice to find that, of late years, the courts of law, both in England and in America, have been disposed to narrow the limits of the operation of such usages and customs, and to discountenance any further extension of them."

*Petition for new trial granted, the same to be limited to the second contract.*

*James Tillinghast & Theodore F. Tillinghast,* for plaintiff.

*James M. Ripley,* for defendants.